**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BARBARA BONE, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>THE YANKEE CANDLE COMPANY, INC.,<br><br>               Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Barbara Bone ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## **INTRODUCTION**

1.      Defendant The Yankee Candle Company, Inc. ("Defendant") sold personal information about Plaintiff Barbara Bone to list brokers, including for example NextMark, Inc., which in turn sold her information to telemarketers and other aggressive advertisers.  As a result, Ms. Bone is being inundated with a barrage of unwanted junk mail and telephone solicitations.  By selling Ms. Bone's personally identifiable information ("PII"), Defendant violated Virginia's Personal Information Privacy Act, Va. Code Ann. §§ 59.1-442, *et seq.* (the "VPIPA").

2.      Documented evidence confirms these facts.  NextMark's website offers to provide access to the PII of 1,441,047 Yankee Candle customers from the "Yankee Candle Mailing List" at a base price of "$100/M [per thousand]," (i.e., 10 cents apiece).

# Yankee Candle Mailing List

The YANKEE CANDLE COMPANY is the leading designer, manufacturer, retailer and wholesaler of premium scented candles, beautiful giftware, and home décor items. Many of Yankee Candle's responsive consumers have made repeat purchases through multiple channels including catalog, website and retail store, and are responsive to all types of offers including gifts, general merchandise, home décor items, books and magazines.

Get Count | Get Pricing | Get More Information

| SEGMENTS | | COUNTS THROUGH 04/30/2019 |
|---|---|---|
| 1,441,047 | TOTAL UNIVERSE / BASE RATE | $100.00/M |
| 200,734 | 3 MONTH BUYERS | + $20.00/M |
| 587,572 | 6 MONTH BUYERS | + $10.00/M |
| 829,854 | 12 MONTH BUYERS | $100.00/M |
| | FUNDRAISING RATE $65/M | |
| | FOOD RATE $75/M | |
| | FACEBOOK MATCH & TARGET | + $25.00/M |
| | FACEBOOK DIGITAL DISPLAY | $55.00/M |

| POPULARITY: | ▪▪▪▪▪ 100 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | 🖼 |
| SOURCE: | OTHER |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 79% FEMALE |
| SPENDING: | $57.00 AVERAGE ORDER |

**DESCRIPTION**

To celebrate the seasons or everyday with affordable luxuries and consumable gifts, THE YANKEE CANDLE COMPANY is the leading designer, manufacturer, retailer and wholesaler of premium scented candles and beautiful giftware for the home. Yankee Candle's responsive consumers have purchased home décor products such as candles, table top gifts and home accent pieces. Many of these buyers have made repeat purchases through multiple channels including catalog, website and retail store. Yankee Candle buyers respond to all types of offers including gifts, general merchandise, home décor items, books and magazines. View sample

Average Income: $75,000

Average Age: 45-54

| SELECTS | |
|---|---|
| $100 | $30.00/M |
| $150 | $35.00/M |
| $200 | $40.00/M |
| $50 | $20.00/M |
| $75 | $25.00/M |
| 3 MONTH HOTLINE | $20.00/M |
| 6 MONTH HOTLINE | $10.00/M |
| AVERAGE PURCHASE | $7.00/M |
| CANCELLATION FEE | $150.00/F |
| FACEBOOK DIGITAL DISPLAY | $55.00/M |
| FACEBOOK MATCH AND TARGET | $25.00/M |
| GENDER/SEX | $8.00/M |
| INTERNET | $12.00/M |
| KEY CODE | $3.00/M |
| RUNNING CHARGE | $10.00/M |
| STATE, SCF, ZIP | $7.00/M |
| TOTAL DOLLAR PURCHASE | |

| ADDRESSING | |
|---|---|
| KEY CODING | $3.00/M |
| EMAIL | $59.00/F |
| FTP | $59.00/F |

RELATED LISTS

*See* Complaint Ex. A.

3.     Defendant also offer access to their "Yankee Candle Enhanced Mailing List" at the same base rate of "$100/M."  The "Enhanced Mailing List," includes the PII of Yankee Candle customers based on, but not limited to, "adult age," "ethnicity/religion," "gender," and "income."

# Yankee Candle Enhanced Mailing List

This file is enhanced for deeper targeting. YANKEE CANDLE COMPANY is the leading designer, manufacturer, retailer and wholesaler of premium scented candles, beautiful giftware, and home décor items.

Get Count | Get Pricing | Get More Information

| SEGMENTS | COUNTS THROUGH 03/31/2019 |
|---|---|
| 1,408,803 TOTAL UNIVERSE / BASE RATE | $100.00/M |
| 210,047 3 MONTH BUYERS | + $20.00/M |
| 557,973 6 MONTH BUYERS | + $10.00/M |
| 781,754 12 MONTH BUYERS | $100.00/M |
| FUNDRAISING RATE $65/M | |
| FOOD RATE $75/M | |
| FACEBOOK MATCH & TARGET | + $25.00/M |
| FACEBOOK DIGITAL DISPLAY | $55.00/M |

**DESCRIPTION**

To celebrate the seasons or everyday with affordable luxuries and consumable gifts, YANKEE CANDLE COMPANY is the leading designer, manufacturer, retailer and wholesaler of premium scented candles and beautiful giftware for the home. Yankee Candle's responsive consumers have purchased home décor products such as candles, table top gifts and home accent pieces. Many of these buyers have made repeat purchases through multiple channels including catalog, website and retail store. Yankee Candle buyers respond to all types of offers including gifts, general merchandise, home décor items, books and magazines. The file is enhanced for deeper targeting.

Average Income: $75,000

Average Age: 45-54

General Comments:

Sample mailpiece is required for approval.

| POPULARITY: | 97 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | OTHER |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 79% FEMALE |
| SPENDING: | $57.00 AVERAGE ORDER |

| SELECTS | |
|---|---|
| $100 | $30.00/M |
| $150 | $35.00/M |
| $200 | $40.00/M |
| $50 | $20.00/M |
| $75 | $25.00/M |
| 3 MONTH HOTLINE | $20.00/M |
| 6 MONTH HOTLINE | $10.00/M |
| ADULT AGE | $10.00/M |
| AVERAGE PURCHASE | $7.00/M |
| CANCELLATION FEE | $150.00/F |
| CHILD AGE | $10.00/M |
| DONORS | $10.00/M |
| ETHNICITY/RELIGION | $12.00/M |
| FACEBOOK DIGITAL DISPLAY | $55.00/M |
| FACEBOOK MATCH & TARGET | $25.00/M |
| GENDER | $8.00/M |
| INCOME | $10.00/M |
| INTERNET | $12.00/M |
| KEY CODE | $3.00/M |
| LIFESTYLE | $10.00/M |
| OMIT HOUSE FILE | $50.00/F |
| RUNNING CHARGE | $10.00/M |
| STATE, SCF, ZIP | $7.00/M |
| ADDRESSING | |
| KEY CODING | $3.00/M |
| EMAIL | $59.00/F |

*See* Complaint Ex. B.

4.      Defendant also offer access to their "Yankee Candle Wiland Direct Modeled File Mailing List" at the same base rate of "$100/M."[1]  The "Wiland Direct Modeled" list allows "Wiland Direct members [to] apply their models to Yankee Candle Company names to connect with their ideal customer type for the highest rate of response."  Available Wiland models include, "Best Donor," "Acquisition Response," and "Long-Term Value."

# Yankee Candle Wiland Direct Modeled File Mailing List

Wiland Direct members can apply their models to Yankee Candle Company names to connect with their ideal customer type for the highest rate of response. This opportunity is open to any participant inthe Wiland Direct Database.

[ Get Count ]  [ Get Pricing ]  [ Get More Information ]

| SEGMENTS | | COUNTS THROUGH 03/31/2019 |
| --- | --- | --- |
| 1,408,803 | TOTAL UNIVERSE / BASE RATE | $100.00/M |
| 1,408,803 | UNIVERSE FOR MODELED SELECTIONS | + $30.00/M |
| | FUNDRAISING RATE $65/M | |
| | FOOD RATE $75/M | |

**DESCRIPTION**

Wiland Direct members can apply their models to Yankee Candle Company names to connect with their ideal customer type for the highest rate of response. This opportunity is open to any participant inthe Wiland Direct Database.

Names selected from a client's model will be net of the client's housefile as well as any other prospect names selected at Wiland, allowing for incremental names to be applied in the merge.

Wiland models available are:

Best Donor, Comprehensive Response, Comprehensive Correlation, Acquisition Response, Core Revenue Response, Long-Term Value, and Source Composite.

| | |
| --- | --- |
| POPULARITY: | ▪▪▪▪▪ 99 |
| MARKET: | CONSUMER |
| CHANNELS: | 🖼 |
| SOURCE: | OTHER |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 79% FEMALE |
| SPENDING: | $57.00 AVERAGE ORDER |

**SELECTS**

| | |
| --- | --- |
| AGE | $5.00/M |
| GENDER | $8.00/M |
| MODELED NAMES | $30.00/M |
| ZIP | $5.00/M |

**ADDRESSING**

| | |
| --- | --- |
| KEY CODING | NOT AVAILABLE |
| EMAIL | $59.00/F |
| FTP | $59.00/F |

**RELATED LISTS**

- BOSTON PROPER - WILAND DIRECT MODELED FILE
- CONDE NAST - WILAND MODELING MASTERFILE
- HEARST HEALTH WILAND DIRECT MODELING (FRMLY RODALE INC)
- MASON COMPANIES WILAND DIRECT MODELED MASTERFILE
- WORLD WILDLIFE FUND WILAND MODELING DATABASE
- CAROL WRIGHT GIFTS - WILAND DIRECT MODELED FILE
- AMERIMARK MASTERFILE - WILAND DIRECT MODELED FILE

*See* Complaint Ex. C.

---

[1] Wiland Direct is a data cooperative.  *See* https://wiland.com/about/company-overview.  The Wilad data cooperative pools "first-party, transaction-level consumer spending data" of "250,000,000 adult U.S. consumers."  *Id.*

5.      The VPIPA clearly prohibits what Defendant has done.  The VPIPA provides:

> No merchant, without giving notice to the purchaser, shall sell to any third person information which concerns the purchaser and which is gathered in connection with the sale, rental or exchange of tangible personal property to the purchaser at the merchant's place of business.

Va. Code Ann. § 59.1-442(A).

6.      Accordingly, Plaintiff brings this Class Action Complaint against Defendant for its intentional and unlawful sale of its customers' PII in violation of the VPIPA, and for unjust enrichment.

## NATURE OF THE CASE

7.      To supplement their sales revenues, Defendant sell their customers' personal information to data miners and other third parties without providing their customers any notice and without their consent.

8.      Defendant's disclosure of PII are not only unlawful, but also dangerous because they allow for the targeting of particularly vulnerable members of society.  In fact, anyone can buy a customer list from Defendant that contains a number of categories of detailed information.  For example, a purchaser could buy a list with the names and addresses of all Yankee Candle customers who are Jewish, over the age of 50, with an income of greater than $100,000, no children in the household, and a history of charitable donations.  Defendant would sell such a list for approximately $152 per thousand customers listed.

9.      While Defendant profit handsomely from the unauthorized sale and disclosure of their customers' PII, they do so at the expense of their customers' privacy and statutory rights because Defendant do not provide their customers any notice, nor do they obtain their customers' consent, before selling their PII.

## PARTIES

10.     Plaintiff Barbara Bone is a natural person and citizen of the State of Virginia.
Plaintiff Bone has made purchases at Yankee Candle retail stores in Virginia.  Every time
Plaintiff Bone made a purchase at a Yankee Candle retail store in the Virginia, the cashier
requested her PII, including her name and address.  Prior to and at the time she made purchases
at Yankee Candle retail stores in Virginia, Defendant did not notify Plaintiff Bone that they sell
the PII of their customers, and Plaintiff Bone has never authorized Defendant to do so.
Furthermore, Plaintiff Bone was never provided any written notice that Defendant sell their
customers' PII, or any means of opting out.  Since making purchases at Yankee Candle, and
continuing to present, Defendant sold, and continues to sell, without consent or prior notice,
Plaintiff Bone's PII to data mining companies including Wiland Direct and others, who then
supplement that information with data from their own files.  Moreover, during that same period,
Defendant sold – and continues to sell and offer for sale – mailing lists containing Plaintiff
Bone's PII to third parties seeking to contact Yankee Candle customers, without first obtaining
Plaintiff Bone's consent or even giving her prior notice of the disclosure and sales.  Because
Defendant sold her PII, Plaintiff Bone now receives junk mail and telephone solicitations.  These
unwarranted offers waste Plaintiff Bone's time, money, and resources.  These harassing junk
mail offerings and phone call solicitations received by Plaintiff Bone are attributable to
Defendant's unauthorized sale of her PII.  Because Plaintiff Bone is entitled by law to privacy in
her PII, and because she paid money for her purchases at Yankee Candle, Defendant's sale of her
PII deprived Plaintiff Bone of the full set of benefits to which she was entitled as a part of her
Yankee Candle purchases, thereby causing economic harm.  Accordingly, what Plaintiff Bone
received (a purchase without statutory privacy protections) was less valuable than what she paid
for (a purchase with accompanying statutory privacy protections), and she would not have been

willing to pay as much, if at all, for her Yankee Candle purchases had she known that Defendant would sell her PII.

11.     Defendant The Yankee Candle Company, Inc. is a Massachusetts corporation with its principal place of business at 16 Yankee Candle Way, South Deerfield, MA 01373. Defendant does business throughout Virginia, Massachusetts, and the entire United States.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Defendant because Defendant conduct substantial business within Massachusetts, such that Defendant have significant, continuous, and pervasive contacts with the State of New Jersey.  Additionally, Defendant's principal place of business is in South Deerfield, Massachusetts.

14.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District, and Defendant's principal place of business is in this District.

## FACTUAL BACKGROUND

### *The Personal Information Market:  Consumers' Personal Information Has Real Value*

15.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . .

[and] individuals are concerned about being defined by the existing data on themselves."[2]

16.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

17.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[4]

18.    In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers.  Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

19.    The scope of data miners' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight,

---

[2] The Information Marketplace:  Merging and Exchanging Consumer Data  (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 15, 2015).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 15, 2015).

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last visited July 15, 2015) (emphasis added).

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 15, 2013).

height, marital status, education level, politics, buying habits, household health worries, vacation
dreams—and on and on."[6]

20.      Further, "[a]s use of the Internet has grown, the data broker industry has already
evolved to take advantage of the increasingly specific pieces of information about consumers
that are now available."[7]

21.      Recognizing the serious threat the data mining industry poses to consumers'
privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus
sent a letter to nine major data brokerage companies seeking information on how those
companies collect, store, and sell their massive collections of consumer data.[8]

22.      In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data
> brokers have developed hidden dossiers on every U.S. consumer.
> This large[-]scale aggregation of the personal information of
> hundreds of millions of American citizens raises a number of
> serious privacy concerns.[9]

23.      Data mining is especially troublesome when consumer information is sold to

---

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June
16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-
consumer-database-marketing.html (last visited May 12, 2015).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce,
Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012)
*available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-
4157-a97b-a658c3c3061c (last visited July 15, 2015).

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving
Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012),
http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-
brokers-about-practices-involving-consumers-personal-information (last visited July 15, 2015).

[9] *Id.*

direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers

often use consumer information to lure unsuspecting consumers into various scams,[10] including

fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Defendant

share information with data miners and direct-mail advertisers, they contribute to the "[v]ast

databases of names and personal information" that are often "sold to thieves by large publicly

traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers"

and other criminals.[11]

24.     Information disclosures like Defendant's are particularly dangerous to the

elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are

often at home, rely on delivery services, and are lonely for the companionship that telephone

callers provide."[12]  The FTC notes that "[t]he elderly often are the deliberate targets of

fraudulent telemarketers who take advantage of the fact that many older people have cash

reserves or other assets to spend on seemingly attractive offers."[13]

25.     Indeed, an entire black market exists where the personal information of

vulnerable elderly Americans is exchanged.  Thus, information disclosures like Defendant's are

---

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 15, 2015).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited July15, 2015).

[12] *Id.*

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 15, 2015).

particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

26.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

***Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases***

27.     As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

28.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

29.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

30.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their

---

[14] *See id.*

[15] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe,  http://www.truste.com/us-consumer-confidence-index-2013/ (last visited July 15, 2015).

[16] *Id.*

personal information themselves.[17]

31.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

32.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### Defendant Unlawfully Sells Its Customers' PII

33.     Every time a customer makes a purchase at a Yankee Candle retail store in Virginia, the cashier requests that the customer provide her PII, including her name and address.

34.     Using that information, Defendant maintains a vast digital database comprised of their customers' PII. Defendant sells their customers' PII to data mining companies including

---

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 15, 2015).
[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 15, 2015).

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 15, 2015) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

Wiland and others, who then supplement that information with additional sensitive personal information about each Yankee Candle customer, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the customer's children.  (*See, e.g.*, **Exhibits A-C**).

35.     Defendant then sells their mailing lists—which include customers' PII, and can include the sensitive information obtained from data miners—to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits A–C**).

36.     As a result of Defendant's data compiling and sharing practices, companies can purchase mailing lists from Defendant that identify Yankee Candle customers by their most intimate details:  income, political affiliation, religious practice, and charitable donations. Defendant's sale of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Yankee Candle will sell—to anyone willing to pay for it—a list with the names and addresses of all Yankee Candle customers who are Jewish, over the age of 50, with an income of greater than $100,000, no children in the household, and a history of charitable donations.

37.     Defendant does not seek their customers' prior consent to any of these sales, nor do they notify their customers about these sales.  Thus, their customers remain unaware that their PII and other sensitive personal information is being bought and sold on the open market.

38.     As a result, Defendant sold and continues to sell their customers' PII – including their purchasing habits and preferences – to anybody willing to pay for it.

39.     By and through these actions, Defendant has intentionally sold to third parties their Virginia customers' PII without consent or notice, in direct violation of the VPIPA with

respect to Plaintiff and other members of the Class.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff seeks to represent a class defined as all Virginia residents who had their

PII sold to third parties by Defendant without consent (the "Class").  Excluded from the Class is

any entity in which Defendant have a controlling interest, and officers or directors of Defendant.

41.     Members of the Class are so numerous that their individual joinder herein is

impracticable.  On information and belief, members of the Class number in the thousands.  The

precise number of Class members and their identities are unknown to Plaintiff at this time but

may be determined through discovery.  Class members may be notified of the pendency of this

action by mail and/or publication through the distribution records of Defendant.

42.     Common questions of law and fact exist as to all Class members and predominate

over questions affecting only individual Class members.  Common legal and factual questions

include, but are not limited to:  (a) whether Defendant obtained consent before selling to third

parties Plaintiff's and the Class's PII; (b) whether Defendant provided notice before selling to

third parties Plaintiffs' and the Class's PII; (c) whether Defendant's sale of Plaintiff's and the

Class's PII violated the Personal Information Privacy Act, Va. Code §§ 59.1-442, *et seq.*; and (d)

whether Defendant's sale of Plaintiff's and the Class's PIIconstitutes unjust enrichment.

43.     The claims of the named Plaintiff are typical of the claims of the Class in that the

named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful

conduct, based upon Defendant's sale of Plaintiff's and the Class's PII.

44.     Plaintiff is an adequate representative of the Class because her interests do not

conflict with the interests of the Class members she seeks to represent, she has retained

competent counsel experienced in prosecuting class actions, and she intends to prosecute this

action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

45.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

### COUNT I
### Violation of the Personal Information Privacy Act
### (Va. Code §§ 59.1-442, *et seq.*)

46.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

47.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant.

48.     Defendant is a "merchant" as that term is defined in the VPIPA.  *See* Va. Code § 59.1-442(A)-(B).

49.     Plaintiff made purchases at Yankee Candle retail stores in Virginia.

50.     At all times relevant, and beginning on the dates Plaintiff made her purchases at

Yankee Candle retail stores in Virginia, Defendant sold Plaintiff's PII, which identified her as a Yankee Candle customer, in at least two ways.

51.     First, Defendant sold mailing lists containing Plaintiff's PII to data mining companies including Wiland, and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Defendant.

52.     Second, Defendant sold its mailing lists containing Plaintiff's PII—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

53.     Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Defendant was able to increase their profits gained from the mailing list sales.

54.     By selling their customer lists, Defendant sold to third persons information which concerns the purchaser and which was gathered in connection with the sale, rental or exchange of tangible personal property to the purchaser the merchant's place of business. *See* Va. Code § 59.1-442(A).

55.     The information Defendant sold indicates Plaintiff's name and address, as well as the fact that she made purchases at Yankee Candle retail stores. Accordingly, the records or information sold by Defendant indicate Plaintiff's identity. *See* Va. Code § 59.1-442(A).

56.     Plaintiff and the members of the Class never consented to Defendant selling their PII to anyone.

57.     Worse yet, Plaintiff and the members of the Class did not receive notice before

Defendant sold their PII to third parties.

58.     The information sold by Defendant was not gathered for purposes of extending credit and was not gathered for the purposes of the recording and sale, rental, exchange or disclosure to others of information obtained from any public body as defined in the Virginia Freedom of Information Act, Va. Code §§ 2-2-3700, *et seq.*

59.     Defendant's sales of Plaintiff's and the Class's PII were not made pursuant incidental to the sale or other disposition of accounts receivable.

60.     Defendant's sales of Plaintiff's and the Class's PII were not made in conjunction with check validation transactions.

61.     Defendant's sales of Plaintiff's and the Class's PII were not made in connection with any sale by Defendant of their retail operations at one or more locations.

62.     Defendant's sales of Plaintiff's PII were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Defendant's revenue.

63.     By selling Plaintiff's PII, Defendant violated Plaintiff's and the Class's statutorily-protected right to privacy under the VPIPA.  *See* Va. Code §§ 59.1-442, *et seq.*

64.     Additionally, because Plaintiff and the members of the Class paid for their Yankee Candle purchases, and Defendant was obligated to comply with the VPIPA, Defendant's unlawful sale of Plaintiff's and the other Class members' PII deprived Plaintiff and the Class members of the full value of their paid-for Yankee Candle purchases.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their PII, Defendant's unlawful sale of their PII caused them to receive less value than they paid for, thereby causing them economic harm.

65.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their PII, a Yankee Candle purchase that keeps their PII private is more valuable than one that does not.

66.     Accordingly, had Plaintiff been adequately informed of Defendant's data sales practices, she would not have been willing to make her Yankee Candle purchases at the price charged, if at all.  Thus, Defendant's unlawful sales caused Plaintiff economic harm.

67.     Defendant's sale of Plaintiff's PII to third parties has also caused an influx of third party print advertisements and marketing calls to her cellular phone.

68.     As a result of Defendant's unlawful and continued disclosure of their PII, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of herself and the Class, Plaintiff seeks:  (1) an injunction requiring Defendant to provide notice and/or obtain consent from Virginia customers prior to the disclosure of their PII as required by the VPIPA; (2) damages in the amount of $100 per violation, per Class member pursuant to Va. Code § 59.1-444; and (3) costs and reasonable attorneys' fees pursuant to Va. Code § 59.1-444.

## COUNT II
### Unjust Enrichment

69.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

70.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

71.     Plaintiff and the Class members conferred benefits on Defendant by providing Defendant with their PII and paying Defendant for their Yankee Candle purchases.  Defendant received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class made their Yankee Candle purchases.

72.     Because Defendant received and processed Plaintiff's and the Class's payments and PII, and because Defendant has employees handling customer accounts and billing as well as customer data, Defendant appreciates or has knowledge of such benefits.

73.     Under the VPIPA, Plaintiff and the Class members were entitled to confidentiality in their PII as part of their Yankee Candle purchases.

74.     Under principles of equity and good conscience, because Defendant failed to comply with the VPIPA, Defendant should not be allowed to retain the full amount of money Plaintiff and the Class paid for their Yankee Candle purchases or the money they received by selling Plaintiff's and the Class's PII.

75.     Plaintiff and the other Class members have suffered actual damages as a result of Defendant's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their PII.  This amount is tangible and will be calculated at trial.

76.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Defendant's failure to inform them that they would sell their PII caused them to make purchases at Yankee Candle retail stores in Virginia when they otherwise would not have.

77.     Further, a portion of the purchase price of each Yankee Candle product sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' PII, as required by the VPIPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their PII—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

78.     To prevent inequity, Defendant should return to Plaintiff and the Class the value

they ascribe to confidentiality of their PII and all money derived from Defendant's sale of

Plaintiff's and the Class's PII.

79.     Accordingly, Plaintiff and the Class members seek an order declaring that

Defendant's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class

restitution in an amount to be calculated at trial equal to the amount of money obtained by

Defendant through their sale and disclosure of Plaintiff's and the Class's PII.

## **PRAYER FOR RELIEF**

80.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly

situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

B.     For an order declaring that Defendant's conduct as described herein violates the Personal Information Privacy Act, Va. Code § 59.1-442;

C.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.     For an award of damages, in the amount of $100 per violation, to Plaintiff and each Class member, as provided by the Personal Information Privacy Act, Va. Code § 59.1-444;

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For injunctive relief as pleaded or as the Court may deem proper; and;

H.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  May 31, 2019

Respectfully submitted,

**COHEN KINNE VALICENTI & COOK LLP**

By:  ___/s/ Kevin M. Kinne___
         Kevin M. Kinne

Kevin M. Kinne
28 North Street, 3rd Floor
Pittsfield, MA 01201
Telephone:  (413) 443-9399
Facsimile:  (413) 553-0331
Email:  kkine@cohenkinne.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  jarisohn@bursor.com
            pfraietta@bursor.com

*Pro Hac Vice Forthcoming

Attorneys for Plaintiff and the Putative Class